UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN CARLOS RIOS,<br><br>            Petitioner,<br><br>    v.<br><br>JEFFREY BEARD, Warden,<br><br>            Respondent. | No.  2:14-cv-2600 GGH P<br><br>ORDER AND FINDINGS AND<br>RECOMMENDATIONS |

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on April 2, 2012 in the Sacramento County Superior Court on charges of second degree robbery (Cal. Penal Code §211) with a prior conviction.  He seeks federal habeas relief on the following grounds:  (1) petitioner was deprived of  effective assistance of trial counsel when funds for a handwriting expert were disallowed by the court; (2) the trial court impeded petitioner's efforts to put forth the preliminary findings of a handwriting expert; (3) as an indigent defendant, petitioner did not receive the assistance of all experts necessary for an adequate defense: and (4) the trial court committed an Ake error and abused its authority in not putting forth the requisite funds for an expert.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

1

1    I. <u>BACKGROUND</u>

2         In its unpublished memorandum and opinion affirming petitioner's judgment of

3    conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

4    following factual summary:

5             In June 2010 a bank teller gave a man in disguise
         approximately $2,600. Following a fingerprint match, an
6         information charged defendant with robbery and alleged that he had
         previously been convicted of robbery. (§ 211.) The information also
7         alleged that the prior conviction brought defendant within the
         provisions of sections 667, subdivisions (b) through (i) and
8         1170.12. A jury trial followed.

9             Robert Schlalos worked as a teller for Chase Bank. One
         afternoon in June 2010 a customer wearing a sweatshirt, hat, and
10        sunglasses approached Schlalos's window. The customer wore a
         "black mop-type thing" on his head, which appeared to be a wig.
11        Schlalos identified the disguised customer from still images
         captured on video footage from the bank.
12
             The customer said he had a check to cash and began
13        checking his pockets. He pulled out a cell phone, then put it back in
         his pocket. The customer then pulled out a note and passed it to
14        Schlalos. Schlalos slid the note to his manager, Danielle Stubbs,
         who was working to his right. The customer did not wear gloves.
15
             The handwritten note stated: "Give me all the money, I have
16        a bomb." After receiving the note, Schlalos opened his money
         drawer and began gathering between $2,600 and $2,700. As
17        Schlalos stacked up the money, the customer grabbed it and ran out
         of the bank.
18
             Schlalos did not notice any tattoos or scars on the robber.
19        Schlalos described the robber as an average size white or Hispanic
         male between five feet ten inches and six feet tall, with a mustache
20        and goatee. In addition, Schlalos described the individual's age as
         between his late 20's and mid–30's. Although defendant fit
21        this description, Schlalos could not make a positive identification.

22            The other bank employees saw the robber, and their
         descriptions matched Schlalos's. Employees testified the robber
23        wore a sweatshirt, hat, and sunglasses. He had close cropped, dark
         hair and appeared to be wearing a wig that looked like women's hair
24        extensions. The robber did not wear gloves. All of the employees
         stated defendant resembled the robber, but they could not positively
25        identify defendant as the robber.

26            A forensic investigator testified regarding fingerprint
         comparisons. Immediately following the robbery, the investigator
27        went to the bank and processed prints found at the scene. Two
         prints taken from the bank door did not match any prints in the state
28        database. The investigator recovered three latent prints from the

2

paper the robber had given Schlalos.

A second forensic investigator compared the prints found on the paper with the fingerprint records from the state database. The investigator concluded the prints on the paper matched defendant's fingerprints.

The match led to defendant's arrest. At the time of his arrest, defendant appeared Hispanic, in his mid–20's, six feet tall, and to weigh 180 pounds. Defendant had no tattoos or scars on his neck or face. When he was arrested, defendant had about $600 and was wearing a very expensive pair of Air Jordan tennis shoes. Defendant's 2004 convictions for robbery and assault were entered into evidence.

**Defense Case**

Defendant's nephew testified he picked up defendant from defendant's girlfriend's house on the day of the robbery between 4:00 p.m. and 4:15 p.m. The robbery took place at approximately 4:10 p.m.

Defendant's girlfriend, Franca Moreno, testified that on the day of the robbery defendant was at her house from 10:00 a.m. until 8:00 p.m. Moreno's mother testified that defendant was with her daughter all day the day of the robbery.

Defendant testified in his own behalf. In 2004 he assaulted a man and took his necklace; he was convicted of assault and robbery. At the time of the robbery in this case, he was on parole.

Defendant testified that on the day of the robbery he was with Moreno all day. That afternoon, defendant's father called and told defendant his car had been stolen. Later that day, his father called back and said it had been found. Late that night defendant and his father recovered the car, which had been vandalized. Defendant's sweatshirt and backpack were missing from the trunk.

The day before his arrest defendant won $300 playing poker at a casino. His father had given him $260 that week, and his sister had given him $200. [N. 2]

[N. 2] A police detective testified that in an interview after his arrest, defendant never mentioned winning any money at a casino before the robbery. Instead, defendant said his sister and some of his neighbors gave him the money. Nor did defendant mention being with Moreno at the time the robbery took place.

Defendant testified he had never been to the bank in question. He did not know how his fingerprints had gotten on the paper but thought the paper might have been in his backpack, which was in the stolen car. Defendant explained that he told officers he was home the day of the robbery, not at his girlfriend's house, because that was the first thing that came into his mind.

1
2

    Defendant's father testified that his car was stolen on the day of the robbery. The car was reported stolen at approximately 4:30 that day. Officers located the car late that evening.

3
4
5

    The jury found defendant guilty of robbery and found the prior conviction allegation true. The court sentenced defendant to a determinate term of 15 years in state prison: the upper term of five years, doubled, plus a five-year enhancement under section 667, subdivision (a). Defendant filed a timely notice of appeal.

6 (Resp't's Lod. Doct. No. 9, at 2-4; People v. Rios, 2013 WL 6529326, *1-2.)

7 II. ANALYSIS

8  A. AEDPA Standards

9   The statutory limitations of federal courts' power to issue habeas corpus relief for persons

10 in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

11 Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

12
13
14

    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

15
16

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19   For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

20 of the United States Supreme Court at the time of the last reasoned state court decision.

21 Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, ⸺ U.S. ⸺

22 –, ⸺⸺, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing

23 Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).  Circuit court precedent may

24 be instructive in determining what law is clearly established by the Supreme Court and whether a

25 state court applied that law unreasonably.  Stanley, 633 F.3d at 859.  However, circuit precedent

26 may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

27 specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ⸺ U.S.

28 ⸺⸺, ⸺⸺, 133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ⸺ U.S. ⸺⸺, ⸺⸺, 132

S.Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1]  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' ").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)).[2]

---

[1]  The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir.2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

[2]  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  Harrington, 562 U.S. at 101, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).

1    Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

2    must show that the state court's ruling on the claim being presented in federal court was so

3    lacking in justification that there was an error well understood and comprehended in existing law

4    beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

5         The court looks to the last reasoned state court decision as the basis for the state court

6    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004).  If

7    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8    previous state court decision, this court may consider both decisions to ascertain the reasoning of

9    the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

10   "[Section] 2254(d) does not require a state court to give reasons before its decision can be

11   deemed to have been 'adjudicated on the merits.'"  Harrington, 562 U.S. at 100.  Rather, "[w]hen

12   a federal claim has been presented to a state court and the state court has denied relief, it may be

13   presumed that the state court adjudicated the claim on the merits in the absence of any indication

14   or state-law procedural principles to the contrary."  Id. at 784-85.  This presumption may be

15   overcome by a showing "there is reason to think some other explanation for the state court's

16   decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

17   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

18   but does not expressly address a federal claim, a federal habeas court must presume, subject to

19   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, —— U.S. ——

20   –, ——, 133 S.Ct. 1088, 1091 (2013).

21        When it is clear, however, that a state court has not reached the merits of a petitioner's

22   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

24   F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

25        The state courts need not have cited to federal authority, or even have indicated awareness

26   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362,

27   365 (2002).  Where the state court reaches a decision on the merits but provides no reasoning to

28   support its conclusion, a federal habeas court independently reviews the record to determine

6

1  whether habeas corpus relief is available under § 2254(d).  <u>Stanley</u>, 633 F.3d at 860; <u>Himes v.</u>

2  <u>Thompson</u>, 336 F.3d 848, 853 (9th Cir.2003).  "Independent review of the record is not de novo

3  review of the constitutional issue, but rather, the only method by which we can determine whether

4  a silent state court decision is objectively unreasonable."  <u>Himes</u>, 336 F.3d at 853.  Where no

5  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

6  reasonable basis for the state court to deny relief."  <u>Harrington</u>, 562 U.S. at 98.

7          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

8  <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n. 3 (9th Cir.2012).  While the federal court cannot analyze

9  just what the state court did when it issued a summary denial, the federal court must review the

10 state court record to determine whether there was any "reasonable basis for the state court to deny

11 relief."  <u>Harrington</u>, 562 U.S. at 98.  This court "must determine what arguments or theories ...

12 could have supported, the state court's decision; and then it must ask whether it is possible

13 fairminded jurists could disagree that those arguments or theories are inconsistent with the

14 holding in a prior decision of [the Supreme] Court."  <u>Id.</u> at 786.  "Evaluating whether a rule

15 application was unreasonable requires considering the rule's specificity.  The more general the

16 rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  <u>Id.</u>

17 Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of

18 federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme

19 Court has cautioned that "even a strong case for relief does not mean the state court's contrary

20 conclusion was unreasonable."  <u>Id.</u>, citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166

21 (2003).

22         The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the

23 state court to deny relief.'"  <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir.2013) (quoting

24 <u>Harrington</u>, 562 U.S. at 98).

25         B.  <u>Petitioner's Claims</u>

26         The petition purports to raise four separate grounds for relief; however, all of those claims

27 are really one and the same:  that the trial court violated petitioner's due process rights and right

28 to effective assistance of counsel when it denied this indigent defendant's request for public funds

for a handwriting expert, which was "reasonably necessary to prepare a defense."  See ECF No. 1

at 6-7; Res't's Lod. Doc. 6 at 14 (Appellant's Opening Brief).  The California Court of Appeals

denied this claim in the following reasoned decision:

> **Expert Witness Fees**
>
> Defendant argues the court erred in denying his request to pay the expert witness fees of his handwriting expert. According to defendant, the court's refusal violated his constitutional right to due process and denied him effective assistance of counsel.
>
> **Background**
>
> Prior to the start of evidence, defense counsel discussed one of the defense witnesses, Larry Stewart. Defense counsel described Stewart as "a handwriting expert who has provided a report indicating he has reviewed past writings of the defendant, and reviewed the bank note used in this case, and it's his opinion that the defendant did not write the words or the characters that are on the bank note." Defense counsel later stated the witness would need to be flown in from Southern California.
>
> At the close of the prosecution's case, the trial court asked if the defense would take longer than one day. Defense counsel responded: "I say I hope to, just because of me not getting my handwriting expert here, which isn't looking good at this point, because he seems to be refusing to come since the county will not cover his travel time. [¶] The last I spoke to him on our lunch break, he said he's not—he's going to refuse to come unless he's going to be compensated for each hour he's gonna be away from his practice, and the panel is absolutely refusing to do that at this point, and they are the ones that foot that bill since I'm appointed on this case. [¶] So without him, I think my case would conclude or come very close to it tomorrow. I still think it could easily go a full day."
>
> After the court asked if anything else needed to be covered, defense counsel stated: "I've never had to ask, but is this—I know there's a way I've approached Courts in the past [ex parte] to appoint an expert, I've done that, I think just on several occasion[s] pursuant to Evidence Code 736, this is a little bit different. [¶] Is there any way that I can slip the expense in the bill that the panel will not pay for the expert?"
>
> The court responded: "The Court doesn't have the facilities or the monies available to enterally [sic] appointing experts. [¶] The Court is concerned over the defense's ability to present their case, yet I do not think that the Court is going to go and say, hey, the Court is going to pay for handwriting expert's time away from his duties to come up from southern California.... [¶] ... [¶] But the Court is not going to step forward, commit court funds to pay for that."

During the defense case, defense counsel again broached the subject of the handwriting expert: "[T]he Court is well aware he had a handwriting expert. I'm not talking from my perspective, but Mr. Rios was relying on a handwriting expert as part of his defense. That expert because of money issues on an appointed case of county wouldn't pay him his travel time. [¶] It came up the last minute when we were in trial. Mr. Rios is upset about that. I don't think at me, but under the circumstance, because if this is a private case, this wouldn't be an issue, but because after $1,500 experts— the handwriting expert we hired refuses to come to court, and now this type of material is exacerbated now since we don't have a handwriting expert to at least give his opinion that the writing, for instance, Mr. Rios in the past are not the writing, so that they don't match the writing of the bank note, and this type of material is, it just seems is a great disadvantage, especially in light of that. [¶] And I can also say when we are done, my office contacted, I think, three or four handwriting experts yesterday because I was trying to—desperately to get someone else to look at these materials, and they all said they are going to need at least a week and a half or two weeks to evaluate everything and be prepared to come to court if their opinion was worthy of coming to court for the defense. [¶] And after Mr. Rios testifies based on everything that's happened and based on Mr. Rios' request, I would ask the Court to for a good cause continuance for a week and a half to two weeks to try to get that in, because I think he has a right to, you know, every acceptable piece of information, every acceptable defense possible, and Mr. Rios wanted that to be part of his defense."

The court replied: "The Court is not inclined to delay the matter. The Court's thinking is handwriting is one of those areas where if the defendant chooses to say it, he can say it. [¶] You've already said he's taking the stand. If he chooses to go and say this is not my handwriting, this is my handwriting, here's samples of my handwriting, the jurors can look at handwriting. [¶] This is [not an] area that the law says has to have an expert, and under that scenario, it wouldn't be one that the Court would say we're going to delay the trial now to get the expert."

**Discussion**

Evidence Code section 730 authorizes the trial court to appoint an expert to render advice and to testify as a witness. In addition, Evidence Code section 731 and Government Code former section 29603 state that the county must pay for those court-ordered expenses. The right to effective assistance of counsel entitles indigent defendants to access to public funds for expert services. (*Ake v. Oklahoma* (1985) 470 U.S. 68, 76–85 [84 L.Ed.2d 53] (*Ake*); *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307 (*Corenevsky*).)

However, it is only *necessary* services to which an indigent defendant is entitled, and the burden rests on the defendant to show that the expert's services are necessary to his or her defense. (*People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1304 (*Gaglione*).) Although during the give-and-take of trial preparation

it may be difficult for counsel to demonstrate an undoubted need for expert services, counsel must "'at least advise the court as to the general lines of inquiry he wishes to pursue, being as specific as possible.'" (*Puett v. Superior Court* (1979) 96 Cal.App.3d 936, 939; see *Corenevsky*, *supra*, 36 Cal.3d at p. 320.)

The decision on the need for the appointment of an expert lies within the trial court's discretion. We will not set aside the trial court's ruling absent an abuse of that discretion. (*Gaglione*, *supra*, 26 Cal.App.4th at p. 1304.)

Here, the trial court and defense counsel discussed the issue of a handwriting expert several times. At first, defense counsel informed the court of the existence of a handwriting expert who had reviewed the handwriting on the note and formed the opinion defendant did not write the note. Subsequently, defense counsel told the court the expert was refusing to testify unless compensated, and asked the court if there was "any way that I can slip the expense in the bill." The court expressed concern over defendant's ability to present his case but declined to commit court funds to pay for the expert.

A few days later, defense counsel discussed the expert again, not from defense counsel's perspective, but from that of his client. According to defense counsel, defendant was relying on the handwriting expert as part of his defense in an effort to prove he did not write the note given to the bank teller. Defense counsel requested a continuance in order to approach other handwriting experts. The court declined the request for a continuance, pointing out defendant could testify himself about the handwriting.

Defendant bears the burden of showing the handwriting expert's testimony was necessary to his defense; however, defense counsel failed to make such a showing, either to the trial court or on appeal. Instead, defense counsel merely stated a handwriting expert had formed an opinion that the handwriting on the note was not that of defendant. Defense counsel provided no details about either the expert or the basis of the expert's proposed testimony. In an aside, defense counsel asked if he could "slip the expense in the bill"; defense counsel did not refer to Evidence Code section 730 or any other authority for his request. While the testimony of a handwriting expert might have been helpful, defense counsel failed to explain how such testimony was necessary to the defense and instead stressed defendant's desire for the testimony.

The trial court pointed out that defendant could testify and deny that the handwriting on the note was his. Handwriting expert testimony differs markedly from ancillary services found necessary in *Ake*, *supra*, 470 U.S. at p. 77. In *Ake*, the defendant's mental condition was relevant to his criminal culpability and the punishment he faced. In addition, jurors, who have no training in psychiatric matters, are not in a position to make a determination of a defendant's mental condition at the time of the crime. Therefore, the defendant had a constitutional entitlement to a psychiatric expert. (*Id.* at pp. 80–83.) Handwriting requires no such specialized

10

expertise. Under Evidence Code section 1417, the genuineness of handwriting may be proved by a comparison made by the trier of fact. In other words, a jury is fully capable of comparing handwriting samples and assessing their authorship. And they were directed to the issue by defendant's own testimony.

In the absence of a showing that the handwriting expert's testimony was necessary, we cannot find the trial court abused its discretion in denying defendant's request to pay expert witness fees. [N. 3]

[N. 3] We find *Taylor v. Superior Court* (1985) 168 Cal.App.3d 1217, cited by defendant, distinguishable. In *Taylor*, the defendant was represented by a community legal services organization counsel and requested the appointment of a fingerprint expert. The trial court agreed the expert was appropriate but found the county should not be required to furnish funds to a federally funded agency. Instead, the defendant should apply to the public defender, who could provide an adequate defense. (*Id.* at pp. 1218–1219.) The appellate court found an abuse of discretion where "necessary ancillary services are denied to an indigent defendant; the court may not require defendant to accept the public defender as his counsel." (*Id.* at p. 1220.) Here, the trial court made no such demand but only declined defense counsel's request to "slip the expense" into the bill. Nor did the trial court find the handwriting expert's testimony necessary; instead, the court noted defendant could testify about the handwriting on the note. And defendant did so testify.

People v. Rios, 2013 WL 6529326, *2-5.

Respondent argues both that there is no clearly established Supreme Court precedent requiring appointment of a non-psychiatric expert in a non-capital case, and that this claim is barred by the non-retroactivity principle of Teague v. Lane as Ake is limited to psychiatric experts. Extending it to handwriting experts in a non-capital case would constitute a new rule of constitutional procedure. Respondent then argues that assuming arguendo that Ake does establish a general constitutional rule concerning indigent defendants' access to expert witnesses in this non-capital case, the claim fails on the merits.

Before considering the merits of this claim, the court must first address respondent's argument that petitioner's claim he was denied a handwriting expert would constitute an impermissible application of a "new rule." See Lambrix v. Singletary, 520 U.S. 518, 524, 117 S.Ct. 1517 (1997) (noting that the Teague question is a threshold issue that ordinarily should be considered before reaching the merits); Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147 (2002)

(holding that prior to considering the merits, a court "must conduct a threshold <u>Teague</u> analysis

when the issue is properly raised by the state"); <u>Caspari v. Bohlen</u>, 510 U.S. 383, 389, 114 S.Ct.

948 (1994) (finding that "if the State does argue that the defendant seeks the benefit of a new rule

of constitutional law, the court must apply <u>Teague</u> before considering the merits of the claim.").

The non-retroactivity principle announced in <u>Teague</u> "prevents a federal court from

granting habeas corpus relief to a state prisoner based on a rule announced after his conviction

and sentence became final." <u>Caspari</u>, 510 U.S. at 389.

> "[A] case announces a new rule if the result was not dictated by
> precedent existing at the time the defendant's conviction became
> final." <u>Teague v. Lane</u>, *supra*, 489 U.S., at 301, 109 S.Ct., at 1070.
> In determining whether a state prisoner is entitled to habeas relief, a
> federal court should apply <u>Teague</u> by proceeding in three steps.
> First, the court must ascertain the date on which the defendant's
> conviction and sentence became final for Teague purposes. Second,
> the court must "[s]urve[y] the legal landscape as it then existed,"
> <u>Graham v. Collins</u>, supra, 506 U.S. [461], at 468, 113 S.Ct. [892],
> at 898 [122 L.Ed.2d 260 (1993) ], and "determine whether a state
> court considering [the defendant's] claim at the time his conviction
> became final would have felt compelled by existing precedent to
> conclude that the rule [he] seeks was required by the Constitution,"
> <u>Saffle v. Parks</u>, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108
> L.Ed.2d 415 (1990). Finally, even if the court determines that the
> defendant seeks the benefit of a new rule, the court must decide
> whether that rule falls within one of the two narrow exceptions to
> the nonretroactivity principle. *See* <u>Gilmore v. Taylor</u>, 508 U.S. 333,
> 345, 113 S.Ct. 2112, 2113, 124 L.Ed.2d 306 (1993).

<u>Id.</u> at 390.  <u>See</u> <u>also</u> <u>O'Dell v. Netherland</u>, 521 U.S. 151, 157, 117 S.Ct. 1969 (1997); <u>Dyer v.

Calderon</u>, 151 F.3d 970, 989 (9th Cir.1998).  The two exceptions to Teague's non-retroactivity

principle are: (1) when the new rule forbids "punishment of certain primary conduct" or prohibits

"a certain category of punishment for a class of defendants because of their status or offense" or

(2) the new rule is a "watershed rule of criminal procedure implicating the fundamental fairness

and accuracy of the criminal proceeding."  <u>Beard v. Banks</u>, 542 U.S. 406, 416–17, 124 S.Ct. 2504

(2004) (quoting <u>Penry v. Lynaugh</u>, 492 U.S. 302, 330, 109 S.Ct. 2934 (1989)).

"A state conviction and sentence become final for purposes of retroactivity analysis when

the availability of direct appeal to the state courts has been exhausted and the time for filing a

petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."

<u>Caspari</u>, 510 U.S. at 390.  Here, petitioner's conviction became final on May 27, 2014, ninety

1   days after the California Supreme Court denied review, and the time for seeking review with the

2   United States Supreme Court expired.  (Res't's Lod. Doc. 11.)

3        Under the second step of the <u>Teague</u> analysis, petitioner must show that <u>Ake v. Oklahoma</u>,

4   470 U.S. 68, 105 S.Ct. 1087 (1985), or subsequent cases following <u>Ake</u> that existed in 2014, hold

5   that the Constitution requires appointment of a handwriting expert for an indigent defendant to

6   challenge the prosecution's evidence.  Petitioner must show that the extended rule was dictated by

7   precedent at the time his conviction was final.  In so doing, petitioner is not necessarily limited to

8   Supreme Court authority, but the absence of the sought rule's extension to a different situation in

9   Supreme Court jurisprudence is an important factor in determining whether a sought extension of

10  the rule was dictated by precedent.  <u>See</u> e.g., <u>United States v. Chan</u>, 792 F.3d 1151, 1156-1157

11  (9th Cir. 2015).

12       Numerous federal courts have decided that both the Constitution and existing Supreme

13  Court precedent do not compel such a conclusion.  The Ninth Circuit in <u>Jackson v. Ylst</u>, 921 F.2d

14  882, 885–86 (9th Cir.1990), held that an <u>Ake</u> claim based on an indigent defendant's request to

15  appoint an expert on eyewitness identification would be a "new rule" barred by <u>Teague</u> because

16  <u>Ake</u> did not address such a right.  Nor could the parties point to "any authority that holds that the

17  federal constitution requires the appointment of such an expert."  <u>Id.</u> at 886.  The court

18  additionally found that the new rule proposed by petitioner did not fall under one of the <u>Teague</u>

19  exceptions.  <u>Id.</u>  <u>See</u> <u>also</u> <u>Vargese v. Uribe</u>, 736 F.3d 817, 825-826 (9th Cir. 2013) (refusing to

20  extend <u>Ake</u> to physical evidence testing); <u>Babick v. Berghuis</u>, 620 F.3d 571, 579 (6th Cir. 2010)

21  (recognizing that its own precedent was unclear in terms of <u>Ake's</u> extension.  Other courts have

22  rejected similar <u>Ake</u> claims on <u>Teague</u> grounds, relying on <u>Caldwell v. Mississippi</u>, 472 U.S. 320,

23  105 S.Ct. 2633 (1985), where the Supreme Court declined to extend <u>Ake's</u> holding to the

24  appointment of a criminal investigator, fingerprint expert, and ballistics expert, explaining "we

25  have no need to determine as a matter of federal constitutional law what if any showing would

26  have entitled a defendant to assistance of the type sought here."  <u>Id.</u> at 323 n. 1.  <u>See</u> <u>Weeks v.</u>

27  <u>Angelone</u>, 176 F.3d 249, 265–66 (4th Cir.1999) (holding that <u>Teague</u> barred due process claim

28  that indigent defendant was entitled to experts in ballistics and pathology based on the court's

13

1   finding that Ake and Caldwell together stood for the proposition that, at the time the defendant's

2   conviction became final, due process only required that an indigent defendant be appointed

3   psychiatric experts when his sanity was at issue in the trial); see also Fernandez v. Valenzuela,

4   2014 WL 293485, *22 (C.D. Cal. Jan. 24, 2014) (noting lack of Supreme Court authority to

5   extend Ake to handwriting expert and denying this claim under Teague); Dvorak v. Figueroa,

6   2014 WL 4627382, *11-12 (Apr. 2, 2014) (acknowledging courts' refusal to extend Ake to other

7   medical experts and investigators);  Covarrubias v. Biter, 2013 WL 5933677, *3 (C.D.Cal.

8   October 31, 2013) ("While the Constitution requires a state to provide access to a psychiatric

9   expert where an indigent's sanity is in question [citation omitted], this requirement has not been

10  extended to the appointment of other experts."); Sanchez v. Hedgpeth, 706 F.Supp.2d 963, 987

11  (C.D.Cal.2010) (rejecting petitioner's claim that he was entitled to the appointment of a forensic

12  expert because "the Supreme Court has not clearly established a constitutional right to the

13  appointment of forensic experts"); Mennick v. Hardison, 2009 WL 187889, *7 (D. Idaho Jan.26,

14  2009) ("[T]he United States Supreme Court has not extended Ake beyond appointment of a

15  psychiatrist to answer the question of defendant competency [ ] ... [and] to broaden that

16  application to requiring trial courts to appoint experts to help defendants support other defenses is

17  beyond the scope of Ake ...."); Atcherley v. Scribner, 2008 WL 4279552, *11 (N.D.Cal. Sept.16,

18  2008) (denying habeas claim on appointment of medical expert, DNA expert, and fingerprint

19  expert based on lack of Supreme Court clearly established constitutional right to such experts).

20      But see, United States v. Snarr, 704 F.3d 368, 405 (5th Cir. 2013) (finding that Ake has

21  been extended to other experts when the need for that expert's testimony was "critical to the

22  conviction"); Little v. Armentrout, 835 F.3d 1240, 1244-45 (8th Cir. 1987) (en banc) (extending

23  Ake generally).

24      Nor does petitioner's proposed extension of the law fit into one of the Teague exceptions.

25  In Gretzler v. Stewart, 112 F.3d 992, 999–1000 (9th Cir.1997), the Ninth Circuit specifically

26  determined that the two exceptions do not apply to Ake claims.  The rule sought by petitioner

27  does not prohibit "a certain category of punishment for a class of defendants because of their

28  status or offense," Penry v. Lynaugh, 492 U.S. 302, 330, 109 S.Ct. 2934 (1989), *overruled on*

1    *other grounds by* <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242 (2002).  It further does not

2    present a new "watershed rule of criminal procedure" that would enhance accuracy and alter our

3    understanding of bedrock procedural elements essential to the fairness of a particular conviction,

4    <u>Teague</u>, 489 U.S. at 311.  As a result, Petitioner's handwriting expert claim is barred by <u>Teague</u>,

5    and should be denied.

6         But even if the undersigned were wrong with respect to the <u>Teague</u> new rule issue, it is

7    beyond peradventure of a doubt that the *Supreme Court* , given the above authority, has not

8    extended the <u>Ake</u> rule to non-psychiatric experts.  As such, petitioner could not overcome the

9    proscription in section 2254(d)(1), that no federal claim is stated unless the Supreme Court has

10   announced the extension through *its* holdings.  The claim would be denied on its merits.

11        <u>Ineffective Assistance of Counsel</u>

12        At first glance, the petition appears to make a separate claim of ineffective assistance of

13   counsel; however, petitioner is really claiming that he was deprived of effective assistance of

14   counsel based on the court's refusal to grant funding for a handwriting expert.  Petitioner is *not*

15   claiming that his counsel was ineffective in the manner in which he argued or handled the request

16   for funds for the handwriting expert.  As such, it is part and parcel of the claim discussed above.

17   Petitioner continues to argue, as he did on appeal, that an indigent defendant has the right to hire

18   experts at public expense when necessary to prepare a defense, as part of the right to effective

19   assistance of counsel.  (ECF No. 1 at 6; Res't's Lod. Doc. 6 at 14.)  <u>See</u> <u>Corenevsky v. Superior</u>

20   <u>Court</u>, 36 Cal.3d 307, 319-20 204 Cal.Rptr.165 (1984).  The State Court of Appeal acknowledged

21   this argument, but held steadfast in its decision that a handwriting expert was not necessary to his

22   defense.  (Res't's Lod. Doc. 9 at 5, 8.)

23        However, to the extent that petitioner is raising a traditional ineffective assistance claim,

24   petitioner misses the point of ineffective assistance of counsel.  Counsel is ineffective when he

25   unquestionably performs his duties at a level below that of reasonable counsel, and that but for

26   such deficient performance, the result in his case would probably have been different, i.e,

27   confidence in the outcome could no longer be maintained. <u>See</u> <u>Strickland v. Washington</u>, 466

28   U.S. 668, 104 S.Ct. 2052 (1984).  In addition, petitioner would have to show that the state court

1   was AEDPA unreasonable in a conclusion that counsel was not ineffective.  Importantly, counsel

2   is not ineffective simply because the trial court erred in application of federal or state law despite

3   counsel's actions-- if indeed any error was made at all in this case.  And, the undersigned knows

4   of no case in which counsel has been required to use his own funds to secure experts in a criminal

5   case at risk of being termed ineffective.

6          The claim for ineffective counsel should be denied.

7   III.   CONCLUSION

8          For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

9   Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

10  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

11  may issue only "if the applicant has made a substantial showing of the denial of a constitutional

12  right." 28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

13  a substantial showing of the denial of a constitutional right has not been made in this case.

14         Accordingly, IT IS ORDERED that:  The Clerk of the Court assign a district judge to this

15  case.

16         IT IS HEREBY RECOMMENDED that:

17         1.  Petitioner's application for a writ of habeas corpus be denied; and

18         2.  The District Court decline to issue a certificate of appealability.

19         These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21  after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  shall be served and filed within fourteen days after service of the objections.  Failure to file

25  ////

26  ////

27  ////

28  ////

16

1   objections within the specified time may waive the right to appeal the District Court's order.

2   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: August 24, 2015

4                                            /s/ Gregory G. Hollows

5                              UNITED STATES MAGISTRATE JUDGE

6

7   GGH:076/Rios2600.hc

17